United States District Court
Southern District of Texas

**ENTERED**

May 21, 2020

David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **SAM  BARR,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:18-CV-00296** |
| | § | |
| **STRIPES LLC, *et al*,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

This is an employment discrimination case in which the plaintiff, Sam Barr ("Barr"), alleges that his former employer, Stripes LLC ("Stripes"), discriminated against him on the basis of his age, subjected him to a hostile work environment, and unlawfully retaliated against him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and Chapter 21 of the Texas Labor Code. Before the Court is Defendants' Motion for Summary Judgment. (Doc. No. 49). Having considered the parties' briefing, the attached evidence, and the parties' arguments at the May 15, 2020 motion hearing, the Court determines that the Motion for Summary Judgment must be denied.

### I.    Background

Stripes employed Barr as a stocker at one of its convenience stores from October 2010 until March 3, 2016, when Barr was fired from his job. Barr's job duties as a stocker included, among others, sweeping, mopping, cleaning the men's restroom, stocking the coolers, receiving shipments, and taking out trash around the store. The purported reason for Barr's firing was poor performance, but Barr argues that this is pretext and that he was really fired because of his age.

In the spring of 2015, higher-ups at Stripes decided that the store where Barr worked was

not performing well. To help turn things around, the area manager, Gilbert Morales, transferred Tim Foster to serve as the general manager of the store and Theresa Ferm to serve as assistant manager. Foster began work at the store in April 2015 and Ferm began work about a month later. Prior to these management changes, Barr had a strong work record and had never been disciplined at work.

Barr claims that, from the start of her tenure, Ferm called him "old man" and "too old" and would suggest that he should retire or quit. (Doc. No. 49-11, at 65). Barr's hours were then reduced from full time to only 30 hours per week, which caused Barr to lose his benefits. It is disputed who reduced Barr's hours, but it was either Ferm or Foster. Barr then went to the Texas Workforce Commission ("TWC") in July 2015 to apply for partial unemployment, but he also told TWC about Ferm's alleged name-calling. *Id.* at 243. Barr's TWC visit prompted two changes according to Barr. First, Barr's hours were increased, though never fully restored to 40 hours per week. Second, Ferm began calling him "old man" and "too old" every day, and telling him he needed to retire because she wanted to replace him with a 19-year-old to whom she could pay minimum wage. *Id.* at 33, 58, 62. According to Barr, Ferm also told him at this time that, because he did not quit after his hours were reduced, she was going to start writing him up. *Id.* at 58.

Barr received his first performance notice from Ferm in August 2015 for not having put towels at the gas pumps. Also in August 2015, Barr claims he went to human resources to complain about Ferm's conduct. Human resources directed Barr to speak with Foster. According to Barr, Foster spoke with Ferm and told her to call Barr "too slow," rather than "too old," which Ferm did for about a week, before she switched to calling Barr "too slow" and "too old." *Id.* at 60. Barr also claims that in October 2015, a temporary assistant manager named Crystal refused to help him fill out his yearly benefits form after telling him "they're going to fire you." (Doc. No. 57-1, at 38-

39). Then, in January 2016, Barr received a second performance notice from Ferm describing a failure to refill an empty sleeve where 40 oz. soda cups are made available to customers. Foster issued Barr a third performance notice on February 2, 2016, for failing to restock the 20 oz. cokes in the coolers. As described further *infra*, Barr strongly contests the validity of each of the performance notices he received.

In mid-February, a young man was hired to start work at the convenience store. He told Barr "I want to find out what your job is." (Doc. No. 49-11, at 59). Then, around the last week of February, Barr claims to have complained once more—this time to both Foster and Morales— about Ferm's name-calling. About a week later, on March 3, 2016, Foster issued Barr his fourth performance notice which doubled as a termination notice. That same day, Barr filed an administrative claim with TWC.

In August 2016, Barr completed and signed an Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire. His verified EEOC charge was signed on December 9, 2016. Barr presumptively received his right-to-sue letter from the EEOC on July 6, 2017. Barr timely filed his original complaint in this case in state court on October 2, 2017. On January 31, 2018, Defendants removed the case to federal court.

## II.   Summary Judgment Standard

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th

Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could resolve the issue in favor of either party. *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson*, 477 U.S. at 248). "In determining whether there is a genuine issue of material fact, all facts must be evaluated in the light most favorable to the non-moving party." *United Fire & Cas. Co. v. Hixson Bros. Inc.*, 453 F.3d 283, 285 (5th Cir. 2006) (citation omitted).

### III.    Analysis

Defendants argue that Barr's state law discrimination claims are barred by a failure to exhaust administrative remedies, and that his federal ADEA claims are barred by a failure to file within 90 days of receiving his right-to-sue letter from the EEOC. Defendants further argue that they are entitled to summary judgment on the substance of Barr's age discrimination, hostile work environment, and retaliation claims. The Court finds and holds that Defendants are not entitled to summary judgment based on either their procedural or substantive arguments.

### A.  Exhaustion of Administrative Remedies and the 90-Day Filing Requirement

Defendants argue that Barr's state law claims are time-barred because Barr did not file an administrative complaint with TWC within 180 days of his termination. *See* Tex. Lab. Code § 21.202(a) ("A complaint under this subchapter must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred").

On March 3, 2016, the same day Barr was discharged, he filed a claim with TWC. Part of what Barr seems to have filed that day was an application for unemployment benefits. (Doc. No. 6-4). But Barr also attests that he filled out some forms related to his discrimination complaints. (Doc. No. 17-1). Barr's actions set into motion a TWC process that appears to have largely focused on his unemployment claim, but eventually touched on his discrimination concerns as well. (Doc.

No. 56-9, at 7). The record before this Court, however, leaves the contours of the TWC proceedings obscure. What is clear is that the TWC process culminated in two hearings, with the latter occurring in September 2016. *Id.* at 5.

The record contains more information regarding Barr's interactions with the EEOC. Barr attests that in early August 2016 he inquired with TWC as to the status of his claims and was invited by TWC to sign an EEOC intake questionnaire form. (Doc. No. 17-1). Barr did so on August 3. At the time, Barr did not check either box at the end of the intake questionnaire form:

> Box 1 [ ] I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I also understand that I could lose my rights if I do not file a charge in time.

> Box 2 [ ] I want to file a charge of discrimination and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

(Doc. No. 17-2). Barr claims that he did not initially check Box 2 because he thought TWC, rather than the EEOC, would be processing his claims. (Doc. No. 17-1). It appears that his intake questionnaire was then mailed to the EEOC and date stamped August 8, 2016. (Doc. No. 17-2).

Barr claims that shortly thereafter he contacted the EEOC and learned he "had to appear in person at the EEOC to check Box 2 on the Intake Questionnaire form, to confirm . . . that [he] wanted to pursue my discrimination case. That occurred within two weeks of my initial filling out the form." (Doc. No. 17-1). Barr claims that he then went to the EEOC in person to check Box 2 on the form before the end of August 2016. *Id.* The intake questionnaire date stamped August 8, 2016 that Barr submitted as an exhibit to this Court shows such a check mark. (Doc. No. 17-2).

The Texas Labor Code provides: "A complaint under this subchapter must be filed not later

than the 180th day after the date the alleged unlawful employment practice occurred." Tex. Lab. Code § 21.202(a). To satisfy this administrative exhaustion requirement, "a claimant may file a complaint with either the EEOC, the federal agency authorized to investigate charges of discrimination, or the TWC, the Texas equivalent." *Prairie View A&M University v. Chatha*, 381 S.W.3d 500, 504 n.4 (Tex. 2012). Because Barr was terminated on March 3, 2016, he had to file his administrative complaint by August 30, 2016. The central issue is thus whether the EEOC intake questionnaire that Barr completed in August 2016 qualifies as an EEOC charge.

In *Federal Express Corporation v. Holowecki*, 552 U.S. 389 (2008), the Supreme Court considered whether an intake questionnaire could qualify as an EEOC charge. The Court held that a filing qualifies as a charge under the ADEA if, in addition to meeting the technical requirements for a charge, it can be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Id.* at 402. The Supreme Court held that the intake questionnaire at issue in that case met this standard because it included a statement from the claimant asking the EEOC to act on her behalf. *Id.* at 405. The Court further suggested that the EEOC needed "some mechanism to separate information requests from enforcement requests" in order to carry out its dual functions of enforcement and information dissemination. *Id.* at 401. The Court urged the EEOC to revise its forms and processes accordingly. *Id.* at 407. "Following *Holowecki*, the EEOC changed the intake form to require employees to clearly express their intent by checking one of two boxes." *Yeh v. Chesloff*, 483 S.W.3d 108, 115 (Tex. App.—Houston [1st Dist] 2015, pet. denied).

Since *Holowecki*, courts have generally held that filing an intake questionnaire with the EEOC qualifies as filing an EEOC charge, if the complainant checks the box that states "I want to file a charge of discrimination . . . ." *See Henderson v. Bank of Am., N.A.,* No. 2:14-cv-0895, 2015

WL 2374519, at *2 (E.D. Tex. May 15, 2015); *Crevier–Gerukos v. Eisai, Inc.,* No. 4:11-cv-0434, 2012 WL 681723, at *8 (S.D. Tex. Feb. 29, 2012). An intake questionnaire does not qualify as an EEOC charge if the petitioner checks only the box requesting to speak with an EEOC employee. *See Yeh*, 483 S.W.3d at 115. A form on which neither box is checked would presumably not qualify unless the form could otherwise be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee." *Holowecki*, 552 U.S. at 402.

Barr argues that he exhausted administrative remedies before August 30, 2016 by filing with the EEOC an intake questionnaire with the appropriate box checked. Defendants argue, however, that the EEOC never actually received notice of Barr's box checking. To support this conclusion, Defendants point to their FOIA request for Barr's EEOC file. That request, which was granted in part and denied in part, produced only a copy of the unchecked intake questionnaire. Barr fiercely disputes Defendants' inference that the EEOC therefore never received his form with the added check mark indicating a desire to file a discrimination charge. According to Barr, when he went to pick up his whole EEOC file in person in early 2018, he was "given two set[s] of documents. One set was numbered. The second set was not numbered but had approximately 9 pages which included forms[.]" (Doc. No. 17-1). Barr explains: "Amidst the two set of documents consisting [sic] my entire file were the two U.S. EEOC Intake Questionnaire form. The form as I submitted it the first time when I mailed it in after filling it out on August 3, 2018. The second one was the same form as I signed it within two weeks of initial submission. I then made copies of the documents and gave them to my attorney." *Id.*

Ultimately then, it is a factual and not a legal issue upon which Defendants' administrative exhaustion argument turns. Defendants have not presented decisive evidence that their preferred

resolution of the factual issue is correct. A reasonable jury could find, based upon the evidence Barr has presented, that Barr returned to check Box 2 on the EEOC form in August 2018. Defendants are therefore not entitled to summary judgment on their argument that Barr failed to exhaust administrative remedies in relation to his state law claims.

As for Barr's federal ADEA claims, Defendants argue that those claims are time-barred because Barr did not file his Second Amended Petition, in which he raised his ADEA claims for the first time, within 90 days of receiving his right-to-sue letter from the EEOC. *See* 29 U.S.C. § 626(e) ("A civil action may be brought under this section . . . within 90 days after the date of the receipt of such notice"). However, Barr's ADEA claims are timely because they relate back to the state law claims in the original petition—which was filed within 90 days of receiving the right-to-sue letter—by virtue of arising from the same transaction or occurrence. Fed. R. Civ. P. 15(c).

### B. Age Discrimination

The ADEA prohibits an employer from discharging an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). Similarly, under the Texas Labor Code, "an employer commits an unlawful employment practice if because of . . . age the employer . . . discharges an individual[.]" Tex. Lab. Code § 21.051. Barr alleges that he was fired because of his age and that the stated reason for his firing—deficient performance—is pretextual.

### i.    Legal Standard

When assessing indirect evidence of discriminatory motive, courts use the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must first establish a *prima facie* discrimination case. To do so, the plaintiff must show that he was: (1) terminated; (2) qualified for the position from which he was terminated; (3) within the age-protected group at the time of termination; and (4) replaced by someone younger or outside

the protected class, or otherwise terminated because of his age. *Phillips v. Leggett & Platt, Inc.*, 658 F.3d 452, 455 (5th Cir. 2011). "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is 'not onerous'." *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

If the plaintiff presents a *prima facie* case, the burden of production shifts to the defendant to proffer a legitimate, non-discriminatory reason for the termination. *McMichael v. Transocean Offshore Deepwater Drilling, Inc.*, 934 F.3d 447, 456 (5th Cir. 2019). "If the employer articulates such a reason, the plaintiff must rebut the employer's purported explanation by showing that the reason given is merely pretextual." *Id.* "The plaintiff retains the ultimate burden of persuading the fact finder that impermissible discrimination motivated the adverse employment decision." *Id.* at 457 (quoting *Bienkowski v. American Airlines, Inc.*, 851 F.2d 1503, 1505 (5th Cir. 1988).

A plaintiff can reveal a reason to be pretextual "by showing that: (1) a discriminatory reason more likely motivated the employer; (2) the employer's reason is unworthy of credence; or (3) he is clearly better qualified than the person selected for the position." *Id.* (internal citations and quotation marks omitted). One specific way to show pretext and discriminatory motive is "by pointing to age-related comments made by a person in charge of firing," or by a person "in a position to influence the decision." *Id.* "A plaintiff can use these comments in both direct and indirect evidence cases." *Id.* To serve as direct evidence of age discrimination, the comment must be "(1) age related, (2) proximate in time to the employment decision, (3) made by an individual with authority over the employment decision at issue, and (4) related to the employment decision at issue." *Id.* (quoting *Moss v. BMC Software, Inc.*, 610 F.3d 917, 929 (5th Cir. 2010)). To serve as indirect evidence of discrimination, the plaintiff must only "show that the comments involve

(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *Id.* at 457–58 (quoting *Squyres v. Heico Cos., LLC*, 782 F.3d 224, 236 (5th Cir. 2015)). To survive summary judgment once a defendant has proffered a non-discriminatory reason for termination, a plaintiff "must offer enough evidence to raise a genuine question of fact regarding [defendant's] reasons for firing him." *Id.* at 456.

Chapter 21 of the Texas Labor code is "effectively identical to Title VII, its federal equivalent, except that Title VII does not protect against age[.]" *Mission Consol. Independent School Dist. v. Garcia*, 372 S.W.3d 629, 633 (Tex. 2012). The Texas Supreme Court has thus "consistently held that those analogous federal statutes and the cases interpreting them guide our reading of [Chapter 21 of the Texas Labor Code]." *Id.* at 634. The ADEA and the Texas Labor Code diverge in one significant way however. Under the ADEA, a plaintiff must show that age was the "but for" cause of the challenged adverse employment action, whereas under the Texas Labor Code, a plaintiff must show only that age was a "motivating factor" in the defendant's decision. *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 440 (5th Cir. 2012).

### ii.    Analysis

Defendants argue that "Barr cannot state a *prima facie* case because he was not replaced by someone younger or otherwise discharged because of his age. Even if he could, Stripes would be entitled to summary judgment because Barr was terminated for a legitimate, nondiscriminatory reason, and not as a pretext for age discrimination." (Doc. No. 49, at 17).

The Court first considers Defendants' argument that Barr cannot make out a *prima facie* case of age-based discrimination. Defendants appear to concede that Barr can establish that he was (1) terminated, (2) qualified, and (3) within the protected age group when terminated. Defendants

focus solely on the fourth element of a *prima facie* case: (4) whether Plaintiff was replaced by someone younger or outside the protected class, or otherwise terminated because of his age. Defendants argue that Barr cannot establish this element because "Barr was not replaced at all since his job duties were merely absorbed by his coworkers." *Id.*

There is, however, a genuine issue of material fact regarding whether Barr was replaced by a younger person. In support of the claim that Barr's duties were merely absorbed, Defendants cite to Ferm's deposition. But in the deposition pages cited, Ferm actually attests that Barr was replaced by a young man who was "getting ready to go to college." (Doc. No. 49-12, at 22). Defendants' claim that Barr's job duties were merely absorbed may be a reference to Ferm's testimony that this young man started work as a stocker at Stripes at least a few weeks before Barr's firing. *Id.* Barr testifies in his deposition, however, that Foster had told Barr he wanted the young man to learn parts of Barr's job, and that the young man himself told Barr "I want to find out what your job is." (Doc. No. 49-11, at 59). Later in her deposition, Ferm changes course and states that the young man was not hired to replace Barr, but she acknowledges immediately thereafter that it was Foster, and not she, who was in charge of hiring. (Doc. No. 49-12, at 22, 31. Foster, in his deposition, expresses a general lack of memory surrounding whether Barr was replaced and, if so, by whom: "so many people came in and out. I really don't remember." (Doc. No. 57-3, at 36).

Moreover, Defendants have offered inconsistent answers about who replaced Barr, and when. In their first set of interrogatory answers, Defendants claim that "Plaintiff was replaced by Cidronio Valdez who was offered and accepted a job with Defendant on February 17, 2016 [two weeks before Barr was fired] . . . Mr. Valdez is currently 24 years old." (Doc. No. 56-7, at 4). Defendants then backtrack in their second set of interrogatory answers. There, Defendants claim that Mr. Valdez actually started work as a "sales associate" in February 17, 2016 and did not

become a stocker until almost a year later. (Doc. No. 56-8 at 3). Accordingly, Defendants claim

Barr's position remained unfilled for over ten months until two men—ages 51 and 49—began

work as stockers in December 2016 and January 2017. *Id.* This claim is at least closer to, yet not

fully consistent with, the position Defendants took in their EEOC position statement, in which they

state that "after Barr was terminated, additional Stockers were not hired until December 2016. The

first, hired on December 1, 2016, was 46 years old and is still employed in the store. The second,

hired on December 9, 2016, was 48 years old." (Doc. No. 56-6 at 5).

      Because Barr has presented evidence that he was replaced by a young man in his twenties,

and because at least one of Defendants' own statements confirms that position, Barr has presented

sufficient evidence such that a reasonable jury could find that he was replaced by someone

younger. Moreover, Barr need not show he was replaced by a younger employee, if he can show

that he was "otherwise discharged because of his age." *Berquist v. Washington Mut. Bank*, 500

F.3d 344, 351 (5th Cir. 2007). As discussed further below, Barr has testified to discriminatory

comments which, considered in connection with other circumstantial evidence, provide grounds

upon which a reasonable jury could find that Barr has established a *prima facie* case of age

discrimination. Defendants are thus not entitled to summary judgment based on their argument

that Barr cannot establish a *prima facie* case of discrimination.

      Defendants next argue that they are entitled to summary judgment because Barr cannot

establish that their stated reason for firing him is pretextual. Defendants claim that Barr was

terminated because of performance deficiencies, as documented in the four performance notices

that Ferm and Foster issued to Barr between August 18, 2015 and March 3, 2016. This argument

fails if there is a genuine issue of material fact as to whether Defendants' reason was pretextual.

"A plaintiff may show pretext either through evidence of disparate treatment or by showing that

the employer's proffered explanation is false or unworthy of credence." *Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010). Barr has provided both types of evidence. He has attested to discriminatory comments and other circumstantial evidence of disparate treatment, and provided reasons to question the validity of the performance notices issued.

Consider first the alleged discriminatory comments. Barr testifies to concrete statements that Ferm made to him. According to Barr, Ferm repeatedly called him "old man" and "too old." (Doc. No. 49-11 at 183). Barr says these insults "became more chronic daily after I went to the Texas Workforce Commission." *Id.* at 180. Barr also asserts that Ferm repeatedly told him that she wanted him to retire so she could hire a nineteen-year-old at the minimum wage. *Id.* at 30, 32. She would allegedly say "I need for you to quit or retire" and "I want to replace you with a 19-year-old." *Id.* According to Barr, Ferm also told him that reducing his hours and writing up complaints against him was part of a strategy to make him quit: "[She] told me that since I didn't quit after they gave me 30 hours, she's going to start writing up reports singling me out in another way[.]" *Id.* at 58. These remarks are not, as Defendants suggest, mere "stray remarks." *See EEOC v. Texas Instruments Inc.*, 100 F.3d 1173 ("This court has repeatedly held that 'stray remarks' do not demonstrate age discrimination").

Indeed, at least some of these comments arguably rise to the level of providing direct evidence of discriminatory intent. To provide direct evidence of age discrimination, a comment must be: "1) age related, 2) proximate in time to the employment decision, 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue." *McMichael*, 934 F.3d at 457. Requirements (1) and (4) are met, considering the alleged comments collectively, and (2) appears to also be met since Barr attests that the "old man" and "too old" comments were "daily" during the seven months leading up to his termination.

Defendants argue, however, that "these alleged comments cannot prove pretext as a matter of law because Ferm was not responsible for Barr's termination." (Doc. 49 at 20). But to satisfy requirement (3), a plaintiff need not establish that the person who made the comments is the same person who did the firing. "While the plaintiff must connect age-related comments to a person with power over the firing decision, the plaintiff can satisfy this requirement by showing that the speaker "is in a position to influence the decision." *Id.* at 457 (citing *Palasota v. Haggar Clothing Co.*, 342 F.3d 569, 578 (5th Cir. 2003)). Here, Barr's termination notice contains the signatures of both Ferm and Foster. (Doc. 49-10). The district manager, Gilbert Morales, states in his deposition that he takes this to mean that both Ferm and Foster fired Barr. (Doc. No. 57-4, at 66). However, even assuming that Foster had the sole authority to fire Barr, as Foster claims, Barr is entitled to argue that Ferm influenced that decision. The termination notice says Barr is being fired because of the four performance notices he had received, half of which were issued by Ferm, and even Defendants acknowledge Ferm "serv[ed] as a witness at the termination meeting." (Doc. No. 49 at 21). It is also undisputed that Foster and Ferm "were good friends while they worked together," that they would regularly call each other "outside the work environment," and that their relationship "extends beyond the workplace." (Doc. No. 57-3, at 31-32). This evidence creates a genuine issue of material fact concerning Ferm's influence over the firing decision.

Moreover, even if Ferm's alleged comments do not rise to the level of direct evidence of discriminatory intent, there remains a genuine issue of material fact regarding whether those comments provide indirect evidence of discrimination. To serve as circumstantial evidence of intent, a comment must demonstrate "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker." *McMichael*, 934 F.3d at 457–58. Ferm's alleged

comments could be treated by a reasonable fact finder as showing discriminatory animus and, for the reasons just discussed, there is a genuine issue of material fact regarding whether Ferm had influence over Foster's termination decision.

Further, Ferm's comments are not the only circumstantial evidence of discriminatory intent that Barr has adduced. He also testifies in his deposition that he received disparate treatment when he was the only one to have his hours reduced: "Ferm originally said, you know, [she was] cutting everybody's hours, but you could go look at the schedule and see that nobody [but me] had their hours cut. The schedule is posted on the general manager's doors for all to see." (Doc. No. 49-11 at 30). Barr also provides evidence that he received no performance notices—and in fact had been awarded a "Stripes Star" (an accolade for hardworking employees) for four years running—until 2015 when Ferm was transferred to the store as the assistant manager. (Doc. No. 56-2).

Barr also directly challenges, as "false or unworthy of credence," *Jackson*, 602 F.3d at 378–79, Defendants' claim that he was fired, not because of his age, but because of deficient performance. Barr does this by challenging the validity of each of the four performance notices that he received during the last seven months of his employment.

Barr received his first performance notice from Ferm on August 18, 2015. The notice documents an oral discussion regarding the fact that thirteen gas pumps were without paper towels even though it is Barr's job "to ensure all pumps are ready for all our guests and their needs." (Doc. No. 49-7). Barr signed the notice, but above his signature added the phrase "Tuesday and Friday are shipment day for McLane." *Id.* According to Barr, Ferm had previously told Barr that "she didn't want [Barr] to order them anymore, and she'd be accountable. . . if she runs out of cups or towels, she's supposed to call surrounding stores to see if someone has extras, and that was her duty." (Doc. No. 49-11 at 41). Barr thus claims that he was unable to put out paper towels on

August 18 because the store was out of paper towels since Ferm had not ordered them. *Id.* He claims that his note about McLane, Stripes' supplier, was his way of trying to say: "I cannot put [the towels] out if [Ferm] doesn't get the shipment in." *Id.* According to Barr, Ferm's response to his explanation was "I'm just going to blame you for these things." *Id.*

Barr received his second performance notice on January 28, 2016, also from Ferm. This incident occurred while Barr was standing in line at Laredo Taco, an internal restaurant in Stripes, during his break time, near the wall where customers retrieved cups for the soda fountain. The notice states: "Samuel was standing in line at Laredo taco, while the wall was completely out of 44 oz cups . . . Samuel is to insure [sic] our customers have the items they need to make a purchase before he goes on break[.]" (Doc. No. 49-8). Barr again signed the notice but this time wrote above his name: "Did not notice 44 oz cup being out." *Id.* In his deposition, Barr explains that normally he worked outside half of the time, but that even then he would come inside once an hour to check on supplies, that when he is outside others are responsible for checking the cups, that even when he is inside he is not the only one responsible for stocking cups, that normally the manager of Laredo Taco and a girl that works under her are the ones who refill the cups, and that last time he came inside on the day in question he saw that the 44 oz cups were still stocked—"I worked outside, but I did walk by, and they weren't missing"—implying that the 44 oz cups ran out either while Barr was outside or after he went on break. (Doc. No. 49-11, at 43–46).

Barr received his third performance notice on February 2, 2016 from Foster. The note reads: "On 2/2/16 Samuel started his shift at 4:30am. Samuel is to ensure all of the drink coolers on the front window are stocked and full for the day. At 6am when [I] came in, the 20 oz cokes had not been stocked, 'empty.' [I] stocked the cokes to ensure we were guest ready." (Doc. No. 49-9). Barr refused to sign the notice. According to Barr, it was not his duty to stock the cooler in

question that day, but rather the duty of the "third shift," and that he should therefore not have been held accountable for the cooler being unstocked. (Doc. No. 49-11, at 49).

Barr received his fourth performance notice, which also served as his termination notice, on March 3, 2016. (Doc. No. 49-10). The notice states "On Monday 2/29/16 I asked Samuel to organize the tote storage outside . . . so they could be picked up. . . . On Thursday 3/3/16 Samuel still had not completed this task. Samuel had 3 days to complete this and failed to complete it." *Id.* A "tote" is a crate used by a vendor to supply the store. The notice is signed by both Foster and Ferm, but Barr refused to sign.

In his deposition, Barr explains his understanding of the incident underlying his fourth performance notice. According to Barr, he had completed half the task of organizing the totes by 8:15 a.m. on March 3, 2016, when Foster came out and stopped him and sent him to do another job. (Doc No. 49-11, at 55). Foster apparently explained to Barr that there were two new employees—one of whom is the young man that later arguably replaced Barr—to whom he would assign the totes job instead. *Id.* He explained that "this is one of the things that he decided that he wants him to learn." *Id.* It appears that the totes-organizing job was still not done by 11:15 a.m., however, because Barr returned to the task: "And then at 11:15, I start the job, you know, and I'm going to get it finished, no problem, but [Foster] stops me." *Id.* Foster allegedly told Barr at that point: "Oh, I want them [the two young hires] to do the job. And there's a big mess over at the other end by the trucks . . . Go over there." *Id.* Barr then left to take care of that other task. Thus, according to Barr, the only reason the totes were not organized is because Foster twice stopped Barr from completing that task and twice told him other employees would be handling it. Barr claims that he had a video documenting the 8:15 a.m. and 11:15 a.m. interactions and that the "Texas Workforce Commission saw the video, too, and confirmed I was telling the truth, that Tim

Foster just lied." *Id.* Barr has not, however, produced the video of the incident as part of his summary judgment evidence, or even suggested that he still possesses the video.

Accordingly, for each of the four performance notices he received, Barr has an explanation of the underlying incident that, if found credible, casts doubt on the validity of the notice. In particular, Barr's account of the fourth incident, which triggered his firing, could prompt a reasonable jury to find that the performance notice was pretextual. Moreover, Barr's account of the incidents underlying his four performance notices, when combined with his testimony about Ferm's discriminatory comments, and the additional circumstantial evidence he provides, raises a genuine issue of material fact regarding discriminatory intent. Taking this evidence in the light most favorable to Barr, the Court concludes a reasonable jury could find that Defendants acted with discriminatory intent and that their purported legitimate reason for firing Barr was pretextual.

### C. Hostile Work Environment

Barr argues that Ferm's daily name-calling created a hostile work environment, in which Crystal and Foster also participated, and that Stripes is strictly liable because the harassing actions of its supervisors resulted in Barr's discharge, a tangible employment action. (Doc. No. 56, at 24).

### i. Legal Standard

To establish a hostile work environment claim based on age discrimination under the ADEA, a plaintiff must establish that "(1) he was over the age of 40; (2) the employee was subjected to harassment, either through words or actions, based on age; (3) the nature of the harassment was such that it created an objectively intimidating, hostile, or offensive work environment; and (4) there exists some basis for liability on the part of the employer." *Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 441 (5th Cir. 2011).

Barr satisfies element (1), and Defendants do not question Barr's showing under element

(2). Defendants instead argue that Barr cannot establish elements (3) and (4): "Stripes is entitled to summary judgment on Barr's hostile work environment claim because his allegations, even if true, do not establish the type of objectively abusive work environment necessary to support such a claim, and even if they were, there is no basis to establish Stripes' liability for the alleged actions of Barr's coworkers." (Doc. No. 49, at 21).

A workplace environment is hostile for purposes of element (3), when it is "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently pervasive to alter the conditions of the victim's employment." *Dediol*, 655 F.3d at 441 (quoting *Alaniz v. Zamora–Quezada,* 591 F.3d 761, 771 (5th Cir.2009)). "Moreover, the complained-of conduct must be both objectively and subjectively offensive." *Id.* To determine whether the conduct is objectively offensive, the Court must consider "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance." *Id.* (quoting *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir.2007)).

As for element (4), the showing required to establish employer liability depends on whether the alleged harasser is a coworker or a supervisor. On the one hand, if the harasser is a coworker, "the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). To establish negligence, a plaintiff must show that the employer "knew or should have known about the conduct and failed to stop it." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 759 (1998). If, on the other hand, the harasser is a supervisor, "different rules apply." *Vance*, 570 U.S. at 424. "If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that

(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* This affirmative defense is called the *Ellerth/Faragher* defense, because of the two Supreme Court cases in which it was first articulated. A harasser qualifies as a supervisor "if he or she is empowered by the employer to take tangible employment actions against the victim." *Id.* A tangible employment action is a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 431.

### ii.    Analysis

The first issue before the Court is whether Barr has raised a genuine issue of material fact regarding whether Ferm's conduct was objectively and subjectively offensive. It is clear that it was subjectively offensive. As discussed further below, Barr allegedly went so far as to tell human resources, Foster, and Morales about the name-calling because he found it distressing. The trickier issue is whether Barr has raised a genuine issue of material fact as to objective offensiveness.

*Dediol*, the Fifth Circuit's seminal case on age-based work harassment, is instructive. In *Dediol*, the Fifth Circuit reversed the district court's grant of summary judgment on an ADEA hostile work environment claim where plaintiff's supervisor exclusively addressed him by "names like 'old mother * * * * *,' 'old man,' and 'pops'" and evidence showed that this occurred "a half-dozen times *daily*" during plaintiff's three-month employment. 655 F.3d at 438. The Fifth Circuit held that the "strident age-related comments about Dediol used by [his supervisor] on almost a daily basis within the work setting, are sufficient to create a genuine issue of material fact concerning Dediol's ADEA-based claim for hostile work environment discrimination." *Id.* at 442-43. The comments here are very similar. Barr testified in his deposition that Ferm called him "old

man," "too old," "too slow," "stupid," and "incompetent" on a daily basis. (Doc. No. 49-11, at 61-62). It also seems that, at least according to Barr, Ferm largely, if not exclusively, referred to him in this way. At one point, Barr replied to being continually referred to as "old man" by saying: "You know, I got a name tag says 'Sam' on it. You don't need to call me these names." (Doc. No. 49-11, at 180). Indeed, Barr attests that, because of Ferm, new hires at Stripes started referring to him as "old man" as well. *Id.* When Ferm went on medical leave for a month in October, the assistant manager who replaced her, Crystal, allegedly continued the name-calling. *Id.* at 63. According to Barr, Ferm repeatedly said "I need for you to quit or retire" and "I want to replace you with a 19-year-old." *Id.* at 32–33. Barr also testifies that Crystal told him more than once: "They're going to fire you. I don't need to help you on anything." (Doc. No. 57-1, at 39–40). As in *Dediol*, these alleged comments create a genuine issue of material fact regarding whether Barr was subjected to an objectively hostile work environment.

However, even if Ferm and Crystal's comments created an objectively hostile work environment, Barr must also establish that Stripes can be held liable for that conduct. Defendants argue that Barr cannot establish employer liability because "the evidence shows that Stripes took prompt, remedial action upon learning of the alleged harassment" and because "Barr unreasonably failed to take advantage of the preventive and corrective opportunities provided by Stripes when he failed to escalate his complaints[.]" (Doc. 49 at 25).

As a preliminary matter, the Court notes that Barr and Defendants analyze the employer liability issue using different frameworks. Defendants assume that Ferm is a non-supervisor, such that employer liability turns on whether Stripes was negligent in failing to stop her harassment. Barr, in contrast, argues that Ferm was a supervisor and, moreover, that her conduct resulted in a direct employment action, such that Stripes is strictly liable for her conduct. Barr has likely raised

a genuine issue of material fact regarding whether Ferm is a supervisor. Barr has presented some evidence that Ferm had the power to set his schedule, and used that power to reduce his work hours to the point where he became ineligible for certain benefits. Such a reduction arguably qualifies as a "tangible employment action." Ferm also had the power to discipline Barr, and courts have held that an individual has supervisory power when they have authority to create a "paper trail" of disciplinary actions and negative evaluations that eventually leads to the employee's termination, even if they do not have the power to terminate them personally. See *Nolen v. S. Bend Pub. Transp. Corp.*, 99 F. Supp. 2d 953, 962 (N.D. Ind. 2000). Nonetheless, the Court focuses here on the negligence issue, since "an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment." *Vance*, 570 U.S. at 447. If Barr has shown a genuine issue of material fact regarding negligence, then his work place harassment claim survives summary judgment.

An employer negligently fails to prevent harassment when the employer "knew of should have known of the harassment and failed to take prompt remedial action." *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 325 (5th Cir. 2004). What constitutes prompt remedial action is a fact-specific inquiry and "not every response by an employer will be sufficient" to absolve the employer of liability. *Id.* An employer "may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not reasonably calculated to halt the harassment." *Id.* (quoting *Skidmore v. Precision Printing and Packaging, Inc.,*188 F.3d 606, 615–16 (5th Cir.1999)). Furthermore, "in determining whether the employer's actions were remedial, [the Fifth Circuit has] considered whether the offending behavior in fact ceased." *Williams-Boldware v. Denton Cty., Tex.*, 741 F.3d 635, 641 (5th Cir. 2014) (quoting *Skidmore*, 188 F.3d at 616). "The plaintiff bears the burden of showing that his employer failed to take effective action."

*Skidmore*, 188 F.3d at 616.

Barr claims to have made at least three complaints about Ferm's name-calling. The first was to TWC in July 2015, in conjunction with Barr's complaint about the reduction in his work hours. After his TWC complaint, Ferm's name-calling allegedly intensified. Barr then claims to have gone to Stripes' human resources department in August 2015 to complain about Ferm's conduct. (Doc. No. 49-11, at 60). Human resources allegedly said "we're not going to take anything in writing. There's no form for this . . . Talk to the general manager," meaning Foster. (Doc. No. 57-1, at 183). Barr claims that after he talked to Foster about the name-calling, Foster told Ferm to stop calling Barr "too old," and to call him "too slow" instead. (Doc. No. 49-11, at 61). According to Barr, Ferm then stopped calling him "too old," for a week. *Id.* at 63. After that she called him both "too old" and "too slow." *Id.* Barr says he tried to complain a third time in February 2016 after both Foster and Morales simultaneously witnessed Ferm yelling names at him. *Id.* at 62. He claims to have "talked to both [Foster and Morales] together." *Id.* During that conversation, they said "they're going to do something." *Id.* The following week, Barr was fired.

Defendants focus their argument on Foster's actions after human resources sent Barr to talk to Foster. Defendants argue that Foster's comment to Ferm to call Barr "too slow" instead of "too old" qualifies as "prompt remedial action." (Doc. No. 49, at 25). According to Barr, however, the conversation only led Ferm to stop calling him "too old" for a week, and that after that she started calling him "too old" and "too slow," causing Barr to feel even more insulted than before. *Id.* at 60. These allegations create a genuine issue of material fact surrounding whether Foster's action were "reasonably calculated to halt the harassment." *Hockman*, 407 F.3d at 325. Moreover, Defendants' argument that Stripes cannot be held liable because Barr "unreasonably failed to escalate his complaints" falls flat. Barr's testimony that he was told by human resources that

written complaints are not excepted, and that he should just talk to his general manager, establishes a genuine issue of material fact regarding whether it was unreasonable for Barr to refrain from escalating his complaints further. (Doc. No. 49-11, at 60).

Defendants further argue for summary judgment based on their affirmative *Ellerth/Faragher* defense. As explained above, that affirmative defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. *See Ellerth*, 524 U.S. at 765. The Court notes that this affirmative defense applies only in cases where the alleged harasser is a supervisor, but no tangible employment action is taken. *Id.* Even so, Defendants have not established that they are entitled to summary judgment on this defense. As an affirmative defense, Defendants bear "the burden to prove both elements by a preponderance of the evidence." *EEOC v. Boh Brothers Construction Co.*, 731 F.3d 444, 462 (5th Cir. 2013). In assessing the first element, Courts often look to "an employer's policies and programs in determining whether it took reasonable measures to prevent discriminatory behavior." *Id.* at 463. However, "[n]ot every policy eliminates liability" because "generic policies that offer no specific complaint procedure may be insufficient[.]" *Id.* For example, in *Boh Brothers Construction*, the Fifth Circuit held that the employer's broad nondiscrimination policy, which offered no specific guidance regarding sexual harassment or specific instructions on how to assert or investigate complaints, was insufficient. *Id.* at 463–464. Here, Defendants cite to their company policy, which they attach to their motion, but they do not explain the policy, defend its adequacy, or discuss how it is implemented in practice. Moreover, for the reasons discussed above, there is a genuine dispute of material fact regarding whether Barr "unreasonably failed to take advantage" of the policy.

### D. Retaliation

Barr claims that his firing a week after making yet another complaint to Foster and Morales about Ferm's chronic name-calling amounts to retaliation for a protected activity under the ADEA.

### i.    Legal Standard

The ADEA makes it unlawful "for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter." 29 U.S.C. § 623(d). To establish a *prima facie* retaliation claim under the ADEA, a plaintiff "must show (1) that he engaged in a protected activity, (2) that there was an adverse employment action, and (3) that a causal link existed between the protected activity and the adverse employment action." *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496–97 (5th Cir. 2015) (quoting *Holtzclaw v. DSC Commc'ns Corp.,* 255 F.3d 254, 259 (5th Cir.2001)). In their motion for summary judgment, Defendants challenge only Barr's ability to establish element (3).

To establish the causation element of a retaliation claim, the employee first needs to "demonstrate that the employer knew about the employee's protected activity." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 883 (5th Cir. 2003). Thereafter, "to withstand summary judgment, [plaintiff] must offer evidence from which the jury may infer that retaliation, in whole or in part, motivated the adverse employment action." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 655 (5th Cir. 2004). "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (quoting *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993)). "However, once the employer offers

a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Id.*

### ii.  Analysis

Defendants argue that Barr cannot show a causal link between any of his complaints and his termination. Defendants argue that Barr's July 2015 TWC complaint cannot undergird a retaliation claim, because Barr has presented no evidence that Foster knew about that complaint. Further, Defendants argue that Barr's August 2015 complaint cannot perform that function either because it is too remote in time from Barr's termination. And, finally, Defendants argue that Barr's February 2016 complaint cannot sustain a retaliation claim either because "by then he had already received three disciplinary actions, and was on his final warning within the company's progressive discipline system." (Doc. No. 49, at 28-29).

The Court need not reach Defendants' arguments concerning the July and August 2015 complaints, because Barr's February 2016 complaint suffices to create a genuine issue of material fact regarding the issue of causation. Barr brought that complaint to Foster and Morales just a week before Foster terminated Barr. That timing itself raises a genuine issue of material fact as to the causal link between the two. *See, e.g., Glorioso v. Mississippi Dept. of Corrections*, 1999 WL 706173, at \*4 (5th Cir. 2018) (holding that a supervisor's recommendation of termination within a week after the plaintiff raised her grievance presented a genuine issue of material fact regarding causation). Defendants argue that, despite this timing, there is no genuine issue of material fact regarding causation because Defendants had a legitimate, non-retaliatory reason for terminating Barr, namely deficient performance. As discussed above, however, Barr's alternative accounts of the incidents underlying his four performance notices create a genuine issue of material fact as to

pretext. This is particularly true because Barr's most detailed and concerning account relates to the incident that precipitated his firing a week after he complained to Foster and Morales.

**IV.   Conclusion**

For the above reasons, the Court concludes that Defendants' Motion for Summary Judgment (Doc. No. 49) must be **DENIED**. Defendants' motion to strike portions of Barr's declaration (Doc. No. 63) is also **DENIED**, though the Court notes it did not rely on Barr's declaration in reaching its conclusion.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 21st day of May, 2020.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE